# In the United States Court of Federal Claims

No. 25-1552
Filed: June 12, 2026
FOR PUBLICATION

|  |  |
|---|---|
| **STEPHEN G. CALANDRELLA, et al.,** | |
| *Plaintiffs,* | |
| **v.** | |
| **UNITED STATES,** | |
| *Defendant.* | |

*William Copley, August J. Matteis,* and *William E. Jacobs*, Weisbrod Matteis and Copley PLLC, Washington, DC; *Edward J. Meehan*, Groom Law Group, Chtd., Washington, DC, for plaintiffs.

*Matthew Jude Carhart*, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

This putative class action is brought by plaintiffs Stephen Calandrella, Charles Powell, Clifford Thygesen, Fuad Ahmed, and Arthur Jacob (collectively "the plaintiffs"), who challenge civil penalties imposed by the United States, acting through the Securities and Exchange Commission ("SEC" or "the Commission"). The plaintiffs argue that these civil penalties were levied in contravention of the Constitution and constitute illegal exactions.

Between 2003 and 2018, the SEC brought administrative proceedings before an in-house administrative law judge, alleging violations of securities laws and seeking civil penalties, against each plaintiff. Messrs. Calandrella, Powell, and Thygesen were found liable in 2006; Mr. Ahmed was found liable in 2015; and Mr. Jacob was found liable in 2018. In each case, the SEC issued orders requiring the plaintiffs, among other sanctions, to pay civil penalties. The civil penalties imposed were as follows: $50,000 for Mr. Calandrella; $20,000 for Mr. Powell; $20,000 for Mr. Thygesen; $12,777,395.80 for Mr. Ahmed; and $160,000 for Mr. Jacob.

In 2024, the Supreme Court decided *SEC v. Jarkesy*, holding that the Seventh Amendment to the Constitution guarantees the right to a jury trial when the SEC seeks civil penalties for securities fraud. 603 U.S. 109, 120 (2024). Consequently, the Court held Congress could not permit the SEC to adjudicate and levy claims for civil penalties administratively, as doing so infringes on the exclusive jurisdiction of Article III courts and violates defendants' constitutional right to trial by jury. *Id.* at 127, 135.

The plaintiffs allege that the SEC's administrative orders requiring payment of civil penalties violated their Seventh Amendment right to a jury trial under *Jarkesy*. They allege that, because the penalties were imposed unconstitutionally, the funds were illegally exacted, and the plaintiffs are entitled to damages.

The defendant moves to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). The defendant argues, among other defenses, that the claims are time-barred by the Tucker Act's six-year statute of limitations. 28 U.S.C. 2501. The plaintiffs counter that the accrual suspension rule applies. The plaintiffs argue that *Jarkesy* represents a change in the law, so they could not have known before that decision that they had a claim, and therefore the limitations period did not begin to run until the Supreme Court decided *Jarkesy* in 2024. The plaintiffs also argue that Federal Circuit precedent barred them from bringing their illegal exaction claim and that precedent is no longer applicable to their claim after *Jarkesy*. Additionally, the plaintiffs argue that Mr. Ahmed's ongoing payments render his claim timely, regardless of whether there was a change in law that suspended the accrual dates for the claims of the other plaintiffs.

*Jarkesy* did not constitute a change in the law, and previous Federal Circuit precedent did not preclude the plaintiffs from bringing their claims before *Jarkesy*. The accrual suspension rule therefore does not apply and cannot save the plaintiffs' untimely claims, which accrued when the SEC issued its final orders imposing civil penalties, and the plaintiffs made their initial payments. Although Mr. Ahmed has continued to make payments within the past six years, the continuing claims doctrine does not apply because he was aware of the entire penalty when the order was entered and is challenging the order itself, not the individual payments. Therefore, none of the claims falls within the Tucker Act's six-year limitations period, and the complaint must be dismissed under RCFC 12(b)(1).

## I.    FACTUAL BACKGROUND

### A.  SEC Civil Penalty Process

Congress created the SEC to administer and enforce three statutes to combat securities fraud and increase market transparency: the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940.[1] Each law regulates different aspects of the securities markets, but all contain anti-fraud provisions that prohibit misrepresenting or concealing material facts.

These anti-fraud provisions are Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act, and Section 206 of the Investment Advisers Act. Section 17(a) of the

---

[1] Although these acts form the nucleus of the SEC's authority and its enforcement of registered entities and investment advisers, the SEC enforces several additional acts, including the Investment Company Act of 1940, Pub. L. No. 76-768, 54 Stat. 789 (codified at 15 U.S.C. § 80a-1 *et seq.*), which regulates mutual funds, exchange-traded funds, and other investment companies. The Investment Company Act is relevant to the SEC proceedings against some of the plaintiffs.

Securities Act prohibits regulated individuals from "obtain[ing] money or property by means of any untrue statement of a material fact," as well as causing certain omissions of material fact. 15 U.S.C. § 77q(a)(2). As implemented by Rule 10b–5, Section 10(b) of the Securities Exchange Act prohibits using "any device, scheme, or artifice to defraud," making "untrue statement[s] of . . . material fact," causing certain material omissions, and "engag[ing] in any act . . . which operates or would operate as a fraud." 17 C.F.R. § 240.10b–5 (2023); *see* 15 U.S.C. § 78j(b). Section 206(b) of the Investment Advisers Act, as implemented by Rule 206(4)–8, prohibits investment advisers from making "any untrue statement of a material fact" or engaging in "fraudulent, deceptive, or manipulative" acts with respect to investors or prospective investors. 17 C.F.R. § 275.206(4)–8(a)(1), (2); *see* 15 U.S.C. § 80b–6(4).

Under these various provisions, "[t]he SEC may bring an enforcement action in one of two forums. First, the Commission can adjudicate the matter itself. *See* [15 U.S.C. § 77h–1, 15 U.S.C. §§ 78u–2, 78u–3, 15 U.S.C. § 80b–3]. Alternatively, it can file a suit in federal court. *See* [15 U.S.C. § 77t, 15 U.S.C. § 78u, 15 U.S.C. § 80b–9]." *Jarkesy*, 603 U.S. at 116.

The agency forum and the judicial forum are distinct, and the process a defendant receives depends on which forum the SEC brings its enforcement action in. When the SEC brings an enforcement action in federal court, a jury typically acts as the fact finder, a life-tenured, salary-protected Article III judge presides; and the litigation is governed by the Federal Rules of Evidence and the Federal Rules of Civil Procedure. When the SEC brings an enforcement action through in-house adjudication, however, the Commission or, more typically, an administrative law judge ("ALJ"), who is hired by the Commission and does not have life-tenure and salary protection, presides and finds the facts, while the SEC's Division of Enforcement prosecutes the case. The ALJ also resolves discovery disputes and determines the scope and form of permissible evidence. The SEC's own rules of practice govern the proceeding, and any judicial review of the outcome is conducted under a standard of review deferential to the SEC's conclusion.

When the SEC sought civil penalties for violations of the anti-fraud provisions it enforces, it originally had to bring such claims in federal court. In 1990, Congress gave the SEC the power to impose civil penalties through administrative proceedings on registered individuals and entities under the Securities Act, the Investment Company Act, and the Investment Advisers Act. *See* Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. No. 101-429, 104 Stat. 931 (codified at 15 U.S.C. § 78u-2(a)(1)).

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, that expanded the SEC's authority to seek civil penalties by making "the SEC's authority in administrative penalty proceedings coextensive with its authority to seek penalties in Federal court." H. R. Rep. No. 111–687 at 78 (2010). Section 929P of the Dodd-Frank Act amended the Securities Act, the Securities Exchange Act, the Investment Company Act, and the Investment Advisers Act by empowering the SEC to impose civil penalties against any person who has violated a provision of these laws. Dodd-Frank Act, Pub. L. No. 111-203, § 929P, 124 Stat. 1376, 1862-65 (2010). Thus, after 2010, the SEC had the authority to seek civil penalties against any person, either in federal court or through its own in-house proceedings, regardless of whether the respondent was a registered individual or entity.

When a Commission member or an ALJ presides over an in-house enforcement proceeding, including when civil penalties are sought, the full Commission can review that official's findings and conclusions, but it is not obligated to do so. *See* 15 U.S.C. § 78d; 117 C.F.R. § 201.360. While judicial review is available once the proceedings have concluded, 15 U.S.C. §§ 77i(a), 78y(a)(1), 80b–13(a), such review is deferential; a reviewing court must treat the agency's factual findings as "conclusive" if they are supported by the record, even when they rest on evidence that could not have been admitted in federal court. *See, e.g.*, 15 U.S.C. § 78y(a)(4).

## B. The Plaintiffs' SEC Adjudications

Each of the five plaintiffs' claims derives from SEC enforcement actions that the Commission adjudicated in-house. At the end of each proceeding, the Commission levied, among other penalties, civil penalties.

### 1. Messrs. Calandrella, Powell, and Thygesen

Between 1993 and 1995, Messrs. Calandrella, Powell, and Thygesen served as directors of the Rockies Fund and as officers or directors of that Fund's portfolio companies. *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1090 (D.C. Cir., 2005) (*Rockies Fund I*). According to the Commission, the Rockies Fund's filings "misstated the classification, valuation, and ownership of stock of the Fund's largest holding, Premier Concepts." *Rockies Fund, Inc. v. SEC*, 298 F. App'x 4, 5 (D.C. Cir. 2008) (*Rockies Fund II*).

The SEC instituted administrative proceedings against the petitioners under various provisions, including Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. *Rockies Fund I,* 428 F.3d at 1092. Following an evidentiary hearing, the ALJ issued an initial decision with three principal findings: first, that Mr. Powell and Mr. Calandrella violated Section 10(b) and Rule 10b–5 by manipulating the stock of a portfolio company, Premier, through matched orders and wash sales*;* second, that the Fund violated Section 10(b) and Rule 10b–5, as well as Section 13(a) and Rules 12b–20, 13a–1, and 13a–13, by "misclassifying, overvaluing, and misrepresenting" ownership of Premier stock in quarterly SEC filings; third, that Mr. Calandrella violated Section 57(k)(1) of the Investment Company Act and Rule 10b–5 by improperly accepting compensation and failing to report the resulting conflict of interest to the Rockies Fund board. *Id.*

Under the authority of the Securities Exchange Act and the Investment Company Act, the ALJ imposed civil penalties totaling $500,000 against Mr. Calandrella and $160,000 each against Mr. Powell and Mr. Thygesen, along with a cease-and-desist order against all three and their fund. *Id.* The ALJ also permanently barred Mr. Calandrella and temporarily barred Mr. Powell and Mr. Thygesen from associating with an investment company. *Id.* On appeal, the full Commission conducted a de novo review and affirmed the ALJ's ruling and sanctions, and denied reconsideration. *Id.*

These three plaintiffs then appealed to the D.C. Circuit, which affirmed in part and vacated in part. *Id.* at 1099. The Court of Appeals affirmed three key findings: (1) that the plaintiffs had acted with "extreme recklessness" by misclassifying the Fund's holdings in SEC

4

filings, *id*. at 1096; (2) that the Fund had overvalued its largest asset, using a valuation methodology that was "inconsistent and slipshod" and reflected a "haphazard process for valuing the largest holding of the Fund constitut[ing] an 'extreme departure from the standards of ordinary care' that should have been obvious to all of the Fund's directors," *id.* at 1097 (quoting *SEC v. Steadman*, 967 F.2d 636, 641-42 (1992)); and (3) that "the Fund falsely claimed ownership of an additional 200,000 Premier shares in its September 1995 filing." *Id*. at 1097-98. The Court of Appeals vacated, as not sufficiently supported by the record, other findings, including that a series of wash sales and matched orders violated Rule 10b-5, and that Mr. Calandrella impermissibly accepted a waiver of legal claims as compensation in exchange for the sale of Fund assets. *Id*. at 1099. The D.C. Circuit also vacated the monetary penalties imposed by the Commission. *Id*.

On remand, the SEC imposed reduced civil penalties based on the findings affirmed by the Court of Appeals. Mr. Calandrella's civil penalty was reduced to $50,000, and Mr. Powell's and Mr. Thygesen's civil penalties were reduced to $20,000. *Rockies Fund II*, 298 F. App'x. at 5. The plaintiffs again appealed, and the D.C. Circuit affirmed the revised sanctions. *Id*. These plaintiffs paid the civil penalties in October 2016. (ECF 12 at ¶ 21.)

### 2. *Mr. Ahmed*

Mr. Ahmed's claim arises from an order issued by the Commission in *In re Success Trade, Inc., Success Trade Secs., Inc., and Fuad Ahmed*, 112 S.E.C. Docket 936 (Aug. 14, 2015). Mr. Ahmed and two companies he led, Success Trade, Inc. ("STI") and Success Trade Securities, Inc. ("STS"), submitted a settlement offer consenting to the Commission's entry of an order requiring payment of civil penalties; the SEC accepted the proposed settlement in its final order. (ECF 12 at ¶ 22.)

From February 2009 through at least February 2013, STI, its subsidiary STS (a registered broker-dealer), and Mr. Ahmed (president and CEO of both entities) offered and sold approximately $20 million in STI promissory notes ("STI Notes") to at least 65 investors through unregistered, non-exempt transactions. *In re Fuad Ahmed*, 112 S.E.C. Docket 936, at *1. Many investors were customers of STS and advisory clients of Investment Adviser A, an investment adviser that offered and sold STI Notes to its clients and whose employees were registered representatives associated with STS. *Id*. Contrary to representations in private placement memoranda and other communications, Mr. Ahmed and his two companies misappropriated proceeds to pay Mr. Ahmed's personal expenses, remit checks to Mr. Ahmed's brother, and fund Investment Adviser A's payroll and operations. *Id*. STI and Mr. Ahmed also used proceeds from later STI Note sales to make interest payments to earlier noteholders. *Id*. In late 2012 and early 2013, Mr. Ahmed and his companies fraudulently induced some noteholders to convert or extend their STI Notes. *Id*. The scheme collapsed in April 2013.

Mr. Ahmed consented to disgorge $12,777,395.80, payment of prejudgment interest of $1,503,424.84, and civil penalties of $12,777,395.80. *Id*. at *9. Mr. Ahmed liquidated STS, and the Commission credited $900,000 of proceeds from that liquidation toward the disgorgement amount. *Id*.

5

Under the agreement, Mr. Ahmed had to pay the penalties within 30 days of the final order; failure to do so would allow the SEC to pursue additional interest under 31 U.S.C. § 3717.  *Id.*  Subsequently, the SEC and Mr. Ahmed agreed that Mr. Ahmed could make periodic payments after the 30-day deadline, with the SEC forgoing enforcement of its right to additional interest.  Thus far, Mr. Ahmed has paid $18,236.32 to the SEC, including 11 payments totaling $14,500 over the last six years.  (ECF 12 at ¶¶ 27-28.)

### 3. *Mr. Jacob*

Mr. Jacob's claim arises from the sanction imposed in *In re Arthur F. Jacob, CPA and Innovative Bus. Sols., LLC*, 113 S.E.C. Docket 5399 (April 14, 2016).  Mr. Jacob, and his company, Innovative Business Solutions LLC ("IBS"), consented to the entry of an order by the Commission setting out findings and imposing sanctions for false statements and omissions of truth.  *Id.* at *1.

The Commission found that Jacob and IBS, unregistered investment advisers to about 30 client households with approximately $18 million under management, violated the anti-fraud provisions of the federal securities laws.  *Id.*  From mid-2009 through at least July 2014, Mr. Jacob and IBS engaged in a fraudulent scheme involving material misrepresentations and omissions, as well as other deceptive practices, to obtain and retain investment advisory clients and collect advisory fees.  *Id.*  During this time, Mr. Jacob (alone and through IBS):

> routinely made false statements and omissions to current clients, prospective clients, and others, where he: concealed his 2003 disbarment and his 2005 suspension from practicing or appearing before the Internal Revenue Service ("IRS"); misstated to clients the risks and profitability of their investments, including in investment newsletters Jacob drafted and distributed; falsely informed clients that he was not required to register as an investment adviser and failed to disclose that, in fact, he and IBS were required to be registered as investment advisers with several states; and provided false information about the advisory services they provided in order to retain trading authority in clients' accounts.

*Id.* at *1-2.

According to the SEC, Mr. Jacob and IBS breached their duties as investment advisers to the clients.  As a result of their scheme, Mr. Jacob and IBS collected approximately $320,000 in investment advisory fees from their clients.  *Id*. at *2.

Following in-house proceedings, the SEC imposed injunctive relief on Mr. Jacob and IBS, who were required to disgorge $320,000, and pay prejudgment interest of $37,986.98 and a civil penalty of $160,000.  *Id*. at *12.  Mr. Jacob and IBS did not seek review of the Commission's final order.  In 2016, Jacob paid $517,986.98 to the SEC.  (ECF 12 at ¶ 34.)

## II.     LEGAL BACKGROUND

### A.   *Jarkesy and its Precedents*

The Seventh Amendment provides that "[i]n [s]uits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. Const. amend. VII.  The phrase "[s]uits at common law" has been construed to refer to cases that at the time of the adoption of the Seventh Amendment were tried in courts of law, in which jury trial was customary, as distinguished from proceedings in courts of equity or admiralty, in which jury trial was not. *Parsons v. Bedford*, 28 U.S. 433, 446-47 (1830) (Story, J.).

The Supreme Court has referred to these suits at common law as claims involving private rights. *Crowell v. Benson*, 285 U.S. 22, 50-51 (1932).  Private rights are legal entitlements that belong to individuals and may be asserted in court.  Such private rights typically involve personal interests for which the holder of the right may seek a legal remedy for a violation of the right through a lawsuit like those that were available at common law when the Bill of Rights was adopted.  The Constitution bars Congress from removing from judicial review matters that are fit for judicial resolution, including claims subject to suit at common law.  *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855).  When such a suit falls within federal jurisdiction, an Article III court must hear it, and if the Seventh Amendment applies, a jury must be provided.  *Stern v. Marshall*, 564 U.S. 462, 484 (2011).

Congress can create causes of action and allow executive agencies to adjudicate them in Article I forums, without a jury, in compliance with the Seventh Amendment, if these causes of action do not resemble suits at common law. *Murray's Lessee*, 59 U.S. (18 How.) at 284.  Such cases have been identified as involving public rights.

Public rights refer to legal claims arising between the federal government and private parties; they are often integral to a public regulatory scheme.  Because disputes arising under such regulatory schemes were amenable to resolution exclusively by the executive agency charged with enforcement of the regulations, Congress could authorize such agencies to assign these matters to non-Article III tribunals, in which parties accused of regulatory violations were not guaranteed the same due process protections that Article III courts provided, including adjudication by a jury. *Jarkesy*, 603 U.S. at 128.

*Jarkesy* is now the leading Supreme Court case defining the distinction between private and public rights.[2]  The holding in *Jarkesy* addressing the scope of public rights builds on the Supreme Court holdings in *Atlas Roofing Co., Inc. v. Occupational Safety and Health Rev.*

---

[2] On June 4, 2026, the Supreme Court decided *FCC v. AT&T, Inc.*, No. 25-406 (June 4, 2026).  *AT&T* involved a claim that the authority of the Federal Communications Commission ("FCC") to impose civil penalties in an in-house proceeding violates the Seventh Amendment. Because of factual distinctions between the FCC's authority and the SEC's authority at issue in *Jarkesy*, the Supreme Court did not need to address the public rights doctrine. *See AT&T*, slip op. at 10-11.  Thus, *AT&T* does not displace *Jarkesy* as the controlling authority on the relationship between the public rights doctrine and the Seventh Amendment.

*Com'n*, 430 U.S. 442 (1977), *Tull v. United States*, 481 U.S. 412 (1987), and *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).

### 1. *Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Comm'n*

The issue in *Atlas Roofing* was whether Congress could, consistent with the Seventh Amendment, create a new cause of action enforceable by an administrative agency in an in-house administrative proceeding without a jury trial.  In resolving the question, the Court focused on whether the cause of action was either identical or analogous to a suit at common law.  When a new cause of action was neither identical nor analogous to a suit at common law, Congress has the authority to remove it from an Article III court and assign its adjudication to an agency.

*Atlas Roofing* arose under the Occupational Safety and Health Act of 1970 ("OSHA"), which established a duty to prevent unsafe or unhealthy working conditions and empowered the Secretary of Labor to set health and safety standards.  OSHA also created remedies for violations: through administrative proceedings, the agency could both obtain abatement orders requiring employers to correct unsafe conditions and impose civil penalties on employers.  Challenges to agency orders were heard by ALJs, who could uphold, modify, or vacate the agency's proposed orders.  No jury trial was available.

The petitioners in *Atlas Roofing* faced abatement and civil penalties under OSHA and unsuccessfully challenged their violations before agency ALJs.  The petitioners then appealed to the Third and Fifth Circuits, arguing that the lack of a jury trial violated the Seventh Amendment.  After differing outcomes in the circuit courts, the Supreme Court granted certiorari.

The Supreme Court concluded that proceedings conducted by agency ALJs were not equivalent to suits at common law for purposes of the Seventh Amendment but instead involved compliance with statutory obligations unique to OSHA.  As the Court explained, when Congress creates new statutory "public rights," it may assign their adjudication to an administrative agency, even if the agency cannot provide a jury trial, without violating the Seventh Amendment's requirement that jury trials be preserved in suits at common law.  *Atlas Roofing*, 430 U.S. at 455.  The Court held that Congress may establish rights not recognized at common law and authorize in-house agency enforcement and adjudication without violating the Seventh Amendment, which does not cover suits unknown at the time of its adoption.

The Court made clear that congressional authority to create a forum for administrative adjudication extends only to new public rights, not pre-existing private rights.  "Our prior cases support administrative factfinding in only those situations involving public rights, e.g., where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, as well as a vast range of other cases as well are not at all implicated."  *Id*. at 458 (cleaned up).

At the same time, the Court rejected the suggestion that the Seventh Amendment applies to all suits that have a historical analogue, regardless of the nature of the right or the forum for adjudication.  Historical practice and precedent support the principle that the right to a jury trial depends not only on the type of issue to be resolved, but also on the chosen forum.  *Id*. at 460-61.

While juries were common factfinders in common-law courts, they were not universally used in all legal contexts.  Generally, when courts of law have supplied a cause of action and adequate remedy to litigants, then cases involving that cause of action would be tried in a court of law before a jury.  When, however, courts of law did not supply an adequate cause of action and remedy to address a specific harm, then courts of equity could try the case without a jury.  *Id*. at 458-59.

Based on this historical principle, the Court held that when Congress identifies an issue and believes the cause of action and remedy provided by the common law are inadequate, Congress may supplant the common law action with a statutory cause of action.  *Id*.  In such instances, when a new right involves the federal government acting in its sovereign capacity, Congress can designate that actions arising under, or seeking to enforce, that new right may be referred to and resolved by a non-Article III body in which the Seventh Amendment right to a jury trial does not apply.

Under OSHA, Congress determined that common law and existing remedies for workplace injuries caused by unsafe conditions were inadequate.  Consequently, it created a new cause of action and remedies unknown to the common law and assigned their enforcement to a specialized tribunal able to provide swift and expert resolution.  *Id*. at 461.  Therefore, because the government, in its sovereign capacity, created a new statutory right under a valid statute, a jury trial was not required.  *Id*. at 452-55.

### 2.  *Tull v. United States*

*Tull* addressed an issue distinct from that considered in *Atlas Roofing*.  *Atlas Roofing* addressed whether Congress could assign a matter to an administrative tribunal without a jury; the issue in *Tull* was whether Congress could assign a legal action to an Article III court but carve out a defendant's right to a jury trial.

The petitioner, a real estate developer, was dumping fill on wetlands.  The federal government sued the petitioner in district court for violating the Clean Water Act ("CWA"), which prohibits the discharge, without a permit, of dredged or fill material into "navigable waters," including adjacent wetlands.  33 U.S.C. §§ 1311, 1344, and 1362(7).  The CWA authorizes injunctive relief against violators and subjects them to a civil penalty not to exceed $10,000 per day.  After denying the developer's timely demand for a jury trial, the district court imposed civil penalties and granted injunctive relief.  The court of appeals affirmed, and the Supreme Court granted certiorari to consider whether the petitioner was entitled to a jury trial.

To resolve the issue, the Supreme Court determined that it first had to "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity," and then "examine the remedy sought and determine whether it is legal or equitable in nature." *Tull*, 482 U.S. at 417-18.  As the Court explained, the first step is more important than the second and that, on balance, if the action and the remedy sought are legal in nature, then the defendant is entitled to a jury under the Seventh Amendment.

The Court analogized the claim under the CWA either to a public nuisance or action in debt claim.  Both these forms of actions were like actions available in common-law courts in

18th century England.  The Court then explained that "[r]emedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity."  *Id*. at 422.  Thus, the imposition of a civil penalty was the type of remedy available at common law and could be enforced only in courts of law and heard by a jury.  From this analysis, the Court concluded that enforcement actions under the CWA were not equitable in nature, because the availability of a civil penalty was designed to punish violators and deter future violations, rather than make other parties or the government whole.

While not a public rights case, *Tull* clarified that the Seventh Amendment can apply to novel actions created by Congress, when the claims and remedies are akin to those at common law.

### 3.  *Granfinanciera, S.A. v. Nordberg*

In *Granfinanciera*, the Supreme Court considered whether the petitioners were entitled to a jury trial in bankruptcy court on a fraudulent-transfer claim.  As codified in the Bankruptcy Code, under a fraudulent transfer claim a trustee may void a transfer or obligation made by the debtor before bankruptcy if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation."  11 U.S.C. § 548(a)(1)(B)(i).  Following chapter 11 bankruptcy, the plan of reorganization approved by the bankruptcy court vested in the trustee in bankruptcy, Nordberg, any causes of action for fraudulent conveyance.  The trustee then filed suit against Granfinanciera, S.A. and Medex, Ltda., in district court for a fraudulent conveyance.

The case was referred to the bankruptcy court, and the defendants requested a jury trial.  The bankruptcy court denied that request and ultimately entered judgment for the trustee.  The defendants' appeals to the district court and the court of appeals were denied, and the Supreme Court granted certiorari to consider whether the denial of a jury trial violated the Seventh Amendment.

The Court first performed a *Tull*-style analysis, analyzing whether a fraudulent-transfer action resembled an 18th-century suit at common law.  *Granfinanciera*, 492 U.S. at 42.  As the Court held, a fraudulent transfer is identical to any fraudulent conveyance claim and is a suit at common law for purposes of the Seventh Amendment.  *Id*. at 46-47.  The Court also concluded that the remedy sought by the trustee was legal rather than equitable in nature.  *Id*. at 48-49.

Following its conclusion that the claim against the petitioners required a jury trial, the Court noted that some claims requiring a jury trial under *Tull* could be exempted from that requirement under *Atlas Roofing*'s public rights analysis.  *Id*. at 49.   Therefore, the Court turned to *Atlas Roofing* to determine whether a fraudulent-transfer claim in bankruptcy fell within the public rights exception.

In *Atlas Roofing*, the Court had explained that Congress can create new statutory public rights and assign their adjudication to an administrative agency without violating the Seventh Amendment.  These new statutory public rights could "effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial

10

right if that statutory cause of action inheres in, or lies against, the Federal Government in its sovereign capacity." *Id*. at 53.

Although *Atlas Roofing*'s public rights exception to the Seventh Amendment could be read broadly, the Court in *Granfinanciera* clarified that this exception should instead be construed narrowly to avoid sweeping in situations in which "'[w]holly private tort, contract, and property cases, as well as a vast range of other cases, are not at all implicated.'" *Id*. at 51 (quoting *Atlas Roofing*, 430 U.S. at 458). The Court put two limitations on the public rights exception: (1) Congress cannot take a claim that existed at common law and refashion and relabel it as a public right, free from Article III adjudication; and (2) even when Congress sets up a regulatory framework and authorizes a government agency to enforce it as a party to a case, proceedings under the regulatory program are not automatically exempt from resolution by an Article III tribunal subject to the Seventh Amendment. *Id*. at 52, 54.

While Congress may create new causes of action involving public rights and assign their adjudication to tribunals without implicating the Seventh Amendment, the Court held that Congress may not deprive parties of their constitutional right to a jury trial in a dispute over their private rights. *Id*. at 53. "'[L]egal claims are not magically converted into equitable issues by their presentation to a court of equity,' nor can Congress conjure away the Seventh Amendment by mandating that traditional legal claims be brought there or taken to an administrative tribunal." *Id*. at 52 (quoting *Ross v. Bernhard,* 396 U.S. 531, 538 (1970)).

Although on its face, *Atlas Roofing* could be read as permitting Congress to fashion public rights that closely resembled traditional legal claims and assign their resolution to adjudication by non-Article III tribunals, the Court clarified that Congress's ability to create public rights is limited to claims that were not subject to adjudication in courts of law when the Seventh Amendment was adopted. Thus, under *Atlas Roofing*, several factors were relevant when determining whether a right is private or public. Under *Granfinanciera* the determining factor was the underlying nature of the claim itself: if the claim is legal in nature, Congress cannot circumvent the right to a jury trial by changing the forum or creating a regulatory scheme. As a result, the Court held that the existence of a regulatory scheme does not necessarily permit Congress to assign the adjudication of all claims within that regulatory scheme to a forum outside Article III adjudication.

The Court went on to hold that the government's status as a party to a case is not determinative of whether a claim falls within *Atlas Roofing*'s public rights exception, although it remains a relevant consideration. When the government is not a party to the case, the key inquiry is whether Congress, acting within its constitutional authority, has created a right so closely integrated into a public regulatory scheme that it is appropriate for agency resolution with minimal Article III judicial involvement. *Id*. at 54. If the right is part of a closely integrated regulatory scheme, it may still be a public right, even when the dispute involves two private parties. When a statutory right is not closely intertwined with a federal regulatory program that Congress has the authority to enact, and that right neither belongs to nor exists against the federal government, then disputes involving that right must be adjudicated by an Article III court. *Id*. at 54-55. The converse is not necessarily true: a right does not automatically become a public right simply because it is intertwined with a federal regulatory program or involves the federal

11

government; such a right may still constitute a private right subject only to adjudication in an Article III court in which the Seventh Amendment applies.

Under this framework, the crucial inquiry becomes whether the right at issue is "legal in nature." *Id.* at 55. If the claim is legal in nature, Congress lacks the constitutional authority to integrate it into a public regulatory scheme, and it must be adjudicated before an Article III court. Although "Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right," it may do so only when the cause of action is not legal in nature. *Id.* at 53. When Congress supplants a common-law cause of action, and that cause of action is legal in nature, "Congress may not assign its adjudication to a specialized non-Article III court." *Id.* (citing *Crowell*, 285 U.S. at 51).

The Court held that a claim for a fraudulent transfer closely resembles a traditional action that existed at common law for which a legal remedy was being sought. Thus, the claim concerned a private right, and Congress lacks the power to remove the claim from Article III jurisdiction. Accordingly, the Seventh Amendment right to a jury applied to the claim.

### 4. *SEC v. Jarkesy*

The question presented in *Jarkesy* was whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties for securities fraud. As the Court noted, its "analysis of this question follows the approach set forth in *Granfinanciera* and *Tull*." *Jarkesy*, 603 U.S. at 120. The case arose when the SEC filed an in-house enforcement action against George Jarkesy, Jr., and Patriot28, LLC for securities fraud.

After a hearing before an ALJ, the SEC found that Jarkesy and Patriot28 had committed fraud and imposed $300,000 in civil penalties. On appeal, the court of appeals vacated the order, ruling that the SEC's in-house process had been unconstitutional for several reasons, including the lack of a jury. The Supreme Court granted certiorari.

Applying the *Tull* test, the Court determined that both the nature of the remedy and the cause of action triggered the application of the Seventh Amendment. The SEC sought civil penalties, a form of monetary relief, for the alleged fraud. The Court noted that it had established in *Tull* that "'civil penalt[ies are] a type of remedy at common law that could only be enforced in courts of law.'" *Id.* at 123 (quoting *Tull*, 482 U.S. at 422). Thus, relying on the analysis in *Tull*, the Court again held that civil penalties are a legal remedy.

The Court then concluded that the cause of action for securities fraud is closely related to common law fraud, as both address similar conduct: misrepresenting or concealing material facts. *Id.* at 125. Because of this close relationship, the two claims cannot be meaningfully separated. *Id.* at 125-26. Thus, when Congress created the statutory claim for civil penalties for securities fraud, it incorporated the common law action for fraud. The overlap between the common law nature of the claim and the monetary remedy sought confirmed that a claim by the SEC for a civil penalty for fraud was a legal action subject to common law rules and the Seventh Amendment applied. *Id.*

12

The Court then addressed whether the SEC's civil penalties fall within the public rights exception. The Court concluded that they do not, thus leaving the applicability of the Seventh Amendment to such claims intact. As the Court emphasized, from its earliest decisions, it has concluded that Congress cannot withdraw from judicial cognizance any matter that, by its nature, is the subject of a suit at common law, in equity, or in admiralty. *Id*. at 132 (quoting *Murray's Lessee*, 59 U.S. (18 How.) at 284). Although Congress can assign matters involving public rights to administrative agencies for adjudication without a jury trial, private rights cannot be removed from Article III courts. *Id*. at 120, 127-32. As the Court reaffirmed, practical considerations, such as the efficiency of the regulatory scheme established by Congress, do not on their own support the expansion of the public rights exception. *Id*. at 132.

The Court concluded that "*Granfinanciera* effectively decide[d]" *Jarkesy*. *Id*. at 134. The majority explained that in *Granfinanciera* the Court had addressed a statutory fraud claim, specifically, a fraudulent-transfer action under the bankruptcy code, and analyzed it under the public rights exception. The Court had concluded there that the substance of the action, not its form, is determinative. That approach required the same outcome in *Jarkesy*, because both cases addressed claims targeting the same conduct covered by common law fraud, applied similar legal concepts, and operated under comparable legal principles. Thus, both cases involved matters of private, rather than public, rights, and Congress could not withdraw such claims from adjudication in a court of law in which the Seventh Amendment applies. *Id*.

Despite *Granfinanciera*, the SEC had argued that *Atlas Roofing*'s public rights exception should apply to exempt SEC adjudications from the Seventh Amendment because Congress had created new statutory obligations, imposed civil penalties for their violation, and assigned decision-making authority to an administrative agency. *Id*. at 135. The Court rejected this argument, noting that the reasoning in *Granfinanciera* refuted the SEC's argument. The Court relied on the portion of *Granfinanciera* in which it had held that Congress cannot circumvent the Seventh Amendment simply by creating a new regulatory scheme and requiring that traditional legal claims be adjudicated within it. If the action resembles a legal claim that existed at common law when the Seventh Amendment was adopted, its statutory origins are irrelevant. *Id*. at 134 (citing *Granfinanciera*, 492 U.S. at 52, 56).

The Court also rejected the SEC's argument that the public rights exception should apply solely because the federal government prosecutes the matter. As the Court explained, it has never held that the mere presence of the United States as a party is enough to trigger the exception. *Id*. at 135 (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 n. 23 (1982) (plurality opinion)). Ultimately, "what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled." *Id*. at 135.

The Court held that Mr. Jarkesy and Patriot28 are entitled to the protections of the Seventh Amendment. Congress cannot convert a traditional common-law fraud claim into a securities-fraud claim, assign adjudication to the SEC, and impose civil penalties, bypassing the right to a jury trial in doing so.

13

Case 1:25-cv-01552-RAH    Document 28    Filed 06/12/26    Page 14 of 28

### B. *Federal Circuit Application of the Public Rights Exception*

In 2012, the Federal Circuit resolved *Ninestar Tech. Co., Ltd. v. Int'l Trade Com'n,* 667 F.3d 1373 (Fed. Cir. 2012). The Federal Circuit was tasked with determining whether the International Trade Commission ("ITC") could assess civil penalties against a Chinese exporter without providing it a jury trial.

Section 337 of the Tariff Act allows the ITC to issue cease-and-desist orders upon a finding that an exporter has engaged in unfair practices and to impose civil penalties when an exporter violates a cease-and-desist order. 19 U.S.C. §1337(f)(2)

Ninestar and its domestic subsidiaries imported and sold ink printer cartridges. The ITC found Ninestar's products infringed certain United States patents and "issued a general exclusion order, limited exclusion orders, and cease and desist orders." *Ninestar*, 667 F.3d at 1376. After the issuance of the exclusion and cease-and-desist orders, Ninestar continued to import and sell the ink cartridges that were the subject of the orders. "An enforcement proceeding was brought and, upon investigation and hearing, the [ALJ] determined that Ninestar was in violation of the orders, and levied a civil penalty. . . ." *Ninestar*, 667 F.3d at 1377.

Ninestar appealed the penalty assessment, arguing, among other defenses, that the proceedings violated its constitutional right to a jury trial. In resolving this issue, the Federal Circuit considered whether the civil penalty at issue, effectively a contempt fine, fell within the public rights exception. The Circuit applied the public rights exception as formulated in *Atlas Roofing* and held that Congress can create new statutory public rights and assign their adjudication to an administrative agency. *Id*. at 1384 (citing *Atlas Roofing*, 430 U.S. at 445). The Federal Circuit held that the:

> [ITC] proceedings are within this category, for Congress "created a new cause of action, and remedies therefor, unknown to the common law, and placed their enforcement in a tribunal supplying speedy and expert resolutions of the issues involved. The Seventh Amendment is no bar to the creation of new rights or to their enforcement outside the regular courts of law."

*Id*. (quoting *Atlas Roofing*, 430 U.S. at 460)

The Federal Circuit also looked to *Granfinanciera* and its holding that Congress may decline to provide jury trials when the proceeding involves "statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency or specialized court of equity." *Id*. (quoting *Granfinanciera*, 492 U.S. at 55 n. 10).

Applying both *Atlas Roofing* and *Granfinanciera,* the Federal Circuit held that "Section 337 proceedings are integral to the control of unfair competition in trade, and the provision of a civil penalty is within regulatory authority and is appropriately assigned to the administrative agency." *Id*.

14

## III.    PROCEDURAL HISTORY

Following the decision in *Jarkesy*, Messrs. Calandrella, Powell, and Thygesen filed a putative class action complaint (ECF 1) on September 18, 2025, alleging that the civil penalties imposed on them without a jury were illegally exacted and must be considered void.  On December 19, 2025, the plaintiffs filed an amended class action complaint (ECF 12), adding the claims of Mr. Ahmed and Mr. Jacob.  The plaintiffs seek damages in an amount equal to the total that the SEC exacted from them, as well as reasonable costs, disbursements, and expenses, including attorney's fees.

On January 14, 2026, the defendant moved to dismiss (ECF 13) under RCFC 12(b)(1) and 12(b)(6).  The defendant argues that there are five reasons the plaintiffs' complaint should be dismissed.  First, the defendant asserts that the plaintiffs' claims are time-barred because their claims accrued more than six years ago.  Second, the defendant argues that the court lacks jurisdiction over the claims because Congress has assigned to the regional circuit courts of appeals exclusive jurisdiction to review final orders of the Commission.  Third, the defendant argues that Messrs. Calandrella, Powell, and Thygesen have all previously appealed to the D.C. Circuit challenging the Commission's order and lost, and this action is based on the "same set of transactional facts."  Fourth, the defendant argues that even if the court has jurisdiction, the plaintiffs fail to state a claim because *Jarkesy* should not be applied retroactively to the plaintiffs' case.  Finally, the defendant argues that Mr. Ahmed and Mr. Jacob's penalties are the result of settlements in which they consented to the payment of a civil penalty without a jury trial, and any Seventh Amendment right these plaintiffs had was voluntarily waived.

On February 11, 2026, the plaintiffs responded (ECF 14), and the defendant replied on March 4, 2026.  (ECF 16.)

On March 16, 2026, the parties were directed to file supplemental briefs, addressing the applicability and relevance, if any, of *Edwards v. Vannoy*, 593 U.S. 256 (2021), to the plaintiffs' claims.  (ECF 17.)  The parties filed their supplemental briefing on March 30, 2026.  (ECF 18; ECF 19.)  Oral argument was held on May 15, 2026.

The complaint and motion to dismiss implicate several novel and difficult issues.  These issues need not be resolved, because the plaintiffs' claims are untimely and no doctrine salvages them.  The motion to dismiss is granted on that basis, and the other issues presented by the parties are not addressed and must await resolution in a case that is timely.

## IV.    JURISDICTION AND STANDARD OF REVIEW

The jurisdiction of the Court of Federal Claims is established by the Tucker Act, 28 U.S.C. § 1491(a), which provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department,

15

or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The Tucker Act gives the Court of Federal Claims jurisdiction to review claims for monetary damages against the United States not arising from a tort.  Among these claims are those for an illegal exaction.  "One way an illegal exaction occurs is when [a] 'plaintiff has paid money over to the Government . . .  and seeks return of all or part of that sum' that was 'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'"  *Virgin Islands Port Auth. v. United States*, 922 F.3d 1328, 1333 (Fed. Cir. 2019) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967) (en banc); s*ee also Boeing Co. v. United States,* 968 F.3d 1371, 1382-83 (Fed. Cir. 2020).

The plaintiffs allege that SEC administrative adjudications and civil penalties imposed in these adjudications without a jury violated the Seventh Amendment and amounted to an illegal exaction.  The Court of Federal Claims is the appropriate forum for such an action.

The defendant challenges the timeliness of the complaint, arguing that the court lacks subject matter jurisdiction.  The plaintiffs bear the burden of showing that the court has jurisdiction by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  Thus, the plaintiffs must establish "jurisdictional timeliness."  *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998).

In determining whether the court lacks subject-matter jurisdiction pursuant to RCFC 12(b)(1), a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  When a plaintiff's asserted jurisdictional facts are challenged, only those factual allegations that the defendant does not controvert are accepted as true.  *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012).  A court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts and may review evidence outside the pleadings.  *Id.*  (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994)).

## V.    DISCUSSION

Among other defenses, the defendant argues that the plaintiffs' claims are barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501.  This statute of limitations is not subject to tolling.  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 530 (2008).  The SEC assessed the relevant civil penalties in 2006 for Messrs. Calandrella, Powell, and Thygesen, in 2015 for Mr. Ahmed, and in 2016 for Mr. Jacob.  Messrs. Calandrella, Powell, Thygesen, and Jacob paid their civil penalties in 2016, and Mr. Ahmed continues to make payments toward his civil penalty.  (ECF 12 at ¶¶ 21, 28, 34.)  The six-year statute of limitations begins to run when a claim accrues.  A claim generally accrues "when all the events that have occurred that fix the alleged liability of the government and entitle the claimant to institute an action."  *Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009); *see also Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988) ("a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.").

16

An illegal exaction occurs "when the 'plaintiff has paid money over to the Government . . . and seeks return of all or part of that sum' that was 'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Virgin Islands Port Authority*, 922 F.3d at 1333 (quoting *Eastport S.S. Corp.*, 372 F.2d at 1007). Thus, an exaction claim is fixed when a plaintiff has paid money to the government in contravention of the Constitution, a statute, or a regulation.

The plaintiffs' claims accrued at the time the civil penalties were imposed and paid. For Messrs. Calandrella, Powell, Thygesen, and Jacob, that date was more than six years before this action was filed. Mr. Ahmed's claim accrued at the time his civil penalty was imposed but before he made all his payments toward that penalty. Even though the SEC and Mr. Ahmed agreed that Mr. Ahmed could make periodic payments, and he has made such payments within six years of the filing of the amended complaint, all the events necessary to fix liability occurred when Mr. Ahmed entered into his settlement agreement, which was more than six years before the amended complaint was filed. Accordingly, as to the claim of each plaintiff, the statute of limitations bars this suit, unless some doctrine can be applied to evade its strictures.

To salvage their claims, the plaintiffs argue that the statute of limitations does not apply because of the accrual suspension rule. Accrual suspension is a doctrine applicable only to cases brought in the Court of Federal Claims, to which 28 U.S.C. § 2501 applies. Under the accrual suspension rule, "the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc). The theory arose in *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 358-59 (Ct. Cl. 1967) ("the running of the statute [of limitations] will be suspended when an accrual date has been ascertained, but plaintiff does not know of his claim"), *cert. denied*, 390 U.S. 975 (1968). "As a judicial interpretation of a legislative enactment, the rule is strictly and narrowly applied: '[p]laintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was "inherently unknowable" at the accrual date.'" *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985) (quoting *Japanese War Notes Claimants Ass'n*, 373 F.2d at 359).

The plaintiffs argue that their claims were "inherently unknowable" before the decision in *Jarkesy*. They argue that *Jarkesy* represents a change in applicable, preexisting law, and at the time the SEC levied the civil penalties against them in contravention of the Seventh Amendment, they could not have known they had claims for illegal exactions under the prevailing *Atlas Roofing* test. In addition to the claims being "inherently unknowable," even if the plaintiffs had been aware of their claims, they argue that the Federal Circuit's decision in *Ninestar* would have barred their illegal exaction claims before *Jarkesy*. Thus, instead of the dates on which their civil penalties were imposed and paid, the plaintiffs argue that the six-year statute of limitations did not begin to run until *Jarkesy* was decided in 2024. Finally, on Mr. Ahmed's claim, the plaintiffs argue that even if there were no intervening change in the law, the statute of limitations has not run on his claim because he has continued to make payments toward his civil penalty, including within the six years before this case was filed.

17

The plaintiffs' complaint raises three statutes of limitations issues: first, whether *Jarkesy* is an intervening change in the law, subjecting the plaintiffs' claims to the accrual suspension rule; second, whether *Ninestar* would have barred the plaintiffs from bringing an illegal exaction claim before *Jarkesy*, allowing the plaintiffs to invoke the accrual suspension rule; and third, whether Mr. Ahmed's claim is timely because he made payments toward his civil penalty within six years of the filing of this case.

### A. Was Jarkesy an Intervening Change in Law

The plaintiffs contend that before *Jarkesy*, they could not have been aware that they had a viable illegal exaction claim. The crux of the plaintiffs' argument is that *Jarkesy* fundamentally redefined the public rights exception by holding that a claim that is legal in nature and resembles a suit at common law is a private right, regardless of whether the government is a party to the suit. According to the plaintiffs, before *Jarkesy*, if the government was a party to a suit and was enforcing a statutory right, the case involved a public right to which the right to a jury did not attach, regardless of if the claim resembled a suit at common law or was legal in nature. Under this reading of the Supreme Court's pre-*Jarkesy* precedent, the plaintiffs did not have a viable illegal exaction claim and therefore could not have reasonably known of their legal rights until *Jarkesy* was decided. Thus, the plaintiffs argue, their claims did not begin to accrue until that date.

A claim is inherently unknowable if prior precedent forecloses a plaintiff from making the legal argument in court. When a decision "overrules or alters prior precedent," the claim becomes knowable and begins the onset of a new limitations period, running from the day "the modifying decision was made." *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 62 (2009), *aff'd*, 862 F.3d 1370, 1378 (Fed. Cir. 2017).

When determining whether a decision alters prior precedent for the purpose of applying the accrual suspension rule, "[c]ourts must look to the reality of a decision's effect, not just to the formal question of whether the decision is binding precedent." *Boyajian v. United States*, 129 Fed. Cl. 336, 339-40 (2016). To bar a suit, the binding precedent that has been altered must be directly on point. That precedent must "effectively bar[ ] plaintiff from making a [] claim." Additionally, the intervening change in law must be the sole reason that a plaintiff's claims have become "legally defensible." *Id*. The basis for construing precedents narrowly is related to Rule 11 and to ethical obligations. On one hand, lawyers may not bring a claim that is unreasonable as a matter of law. On the other hand, applying precedents too broadly to bar claims outside their proper confines would inhibit the development of the law.

Courts have, in accord with applying the accrual suspension rule narrowly, concluded that a misunderstanding of the law or of one's legal rights does not trigger the accrual suspension rule. Thus, accrual suspension does not apply when "all the relevant facts were known [but] the meaning of the law [ ] was misunderstood." *Catawba Indian Tribe of S.C. v. U.S.*, 982 F.2d 1564, 1572 (Fed. Cir.), *cert. denied*, 509 U.S. 904 (1993); *see also United States v. Kubrick*, 444 U.S. 111, 122 (1979) (for purposes of the statute of limitations, "a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should [not] receive identical treatment"). A decision that merely clarifies prior precedent or applies prior precedent to new facts but does not alter the precedent is not an intervening change in the law. *See Smith v.*

*U.S. SEC,* 171 F.4th 798, 809-10 (6th Cir. 2026) (rejecting the argument that *Jarkesy* changed the law and noting that when "a prior case effectively dictates a subsequent outcome, there is no intervening change in law").

The plaintiffs contend that *Atlas Roofing* had defined public rights as "all claims in which the Government enforced a right that Congress creates by statute." (ECF 14 at 22.) According to the plaintiffs, under *Atlas Roofing* a public right has two main features: (1) it is created by a statute within Congress's constitutional power; and (2) it is enforced by the government in its sovereign capacity. (*Id.*) (quoting *Atlas Roofing Co.*, 430 U.S. at 450). Thus, because Congress created the SEC and the securities fraud statutes the SEC enforces, the enforcement proceedings the plaintiffs challenge fell within the public rights exception to the Seventh Amendment under *Atlas Roofing*.

The plaintiffs go on to argue that *Granfinanciera* expanded the public rights exception to include certain private disputes. Even though *Granfinanciera* held that government enforcement of a right is not the dispositive factor in a public rights analysis, the plaintiffs contend that this holding did not extend to cases involving the federal government. (*Id.* at 23-24.) Thus, they argue, *Jarkesy*'s adoption of *Granfinanciera*'s reasoning was the first time that *Granfinanciera* was applied to a case involving the government as a party. Therefore, *Jarkesy* fundamentally altered the *Atlas Roofing* analysis in a way *Granfinanciera* did not. (*Id.* at 24.) Under this view, it is *Jarkesy* in which the Supreme Court clarified that the nature of the claim determines whether a right is private or public, not whether the government enforces the right.

The plaintiffs' argument is flawed. Although *Atlas Roofing* did provide wide latitude to Congress to create public rights through statute and to allow the government to enforce those rights in its sovereign capacity, Congress was not thereby allowed to take claims recognized at common law and refashion them as public rights. This principle was reinforced in *Granfinanciera*. Therefore, *Jarkesy*'s holding that the nature of the claim is the most pertinent component of the public rights analysis did not change law but only reiterated longstanding, basic principles of constitutional law. Similarly, while *Granfinanciera* altered the scope of the public rights exception, the Supreme Court did not limit its analysis of public rights to cases involving private parties. Although the Court distinguished between cases involving private parties and those involving the government, it described how the public rights analysis applies in all cases, regardless of the parties. *Granfinanciera*, 492 U.S. at 54-55 ("If a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court. If the right is legal in nature, then it carries with it the Seventh Amendment's guarantee of a jury trial.") *Jarkesy* was not necessary to apply *Granfinanciera* to all public rights cases, including the plaintiffs' case. More importantly, the theory underlying *Jarkesy* was not foreclosed by *Granfinanciera* but is, instead, consistent with that prior case.

The plaintiffs argue that before *Jarkesy*, the public rights analysis rested on whether Congress created the right and whether the government enforced it. That argument finds no support in the applicable precedents. The Supreme Court consistently centered its public rights analysis on the nature of the claim at issue. In *Atlas Roofing*, the Court made clear that "[w]holly private tort, contract, and property cases, as well as a vast range of other cases, are not at all implicated" by the public rights exception. 430 U.S. at 458. In *Granfinanciera,* the Court

19

strengthened and clarified the importance of the nature of the claim in the public rights analysis. As in *Atlas Roofing*, *Granfinanciera* emphasized that the type of claim Congress created is essential to the public rights analysis. As the Court explained, Congress cannot take a claim that already existed at common law, refashion it into a similar claim enforceable by the government, and label it a public right, not subject to the Seventh Amendment. 492 U.S. at 51-52. Supported by its analysis in *Tull*, the Court held that a claim identical to or like a suit at common law or that is legal in nature, is a private right, regardless of whether Congress created it. *Id*.

*Jarkesy* applies the same analytical approach as *Granfinanciera*. The Supreme Court explicitly noted that "*Granfinanciera* effectively decide[d *Jarkesy*]." 603 U.S. at 109. Both *Granfinanciera* and *Jarkesy* addressed claims targeting the same underlying conduct as common law fraud. As both cases addressed claims that are legal in nature, the underlying actions they addressed were held to involve matters of private, rather than public, rights. Consequently, Congress is without power to withdraw such claims from Article III courts and the Seventh Amendment jury such courts provide. *Id*. at 134.

The Court in *Atlas Roofing*, *Granfinanciera*, and *Jarkesy*, all held that the nature of the claim is the crucial component of the public rights analysis. If a claim is legal in nature or resembles a claim at common law, it must be a private right to which the Seventh Amendment jury right attaches. The plaintiffs' argument that before *Jarkesy* courts would look only to whether Congress had created the right and whether the government was the party enforcing it misstates the law.

The plaintiffs seek protection under the aegis of their reading of *Granfinanciera*, which, they argue did not involve a public right "as defined by *Atlas Roofing* because it involved a claim between private parties." (ECF 14 at 23.) Thus, in pre-*Jarkesy* cases involving the government acting in its sovereign capacity, "[t]he Supreme Court appeared to reaffirm *Atlas Roofing*'s definition of 'public rights.'" (*Id*.) In this reading, *Jarkesy* changed the law because it extended *Granfinanciera* to public rights cases in which the government is a party to the suit.

The Court in *Granfinaciera* did not limit its rationale to cases involving private parties and did not apply *Atlas Roofing*'s definition of public rights only to cases involving the government. Rather, the Court rejected the notion that anytime the enforcement of a right is given to a federal agency or that a right may be enforced against a federal agency the right is necessarily a public right. In *Northern Pipeline*, the Court previously found that "the presence of the United States as a proper party to the proceeding is a necessary *but not sufficient* means of distinguishing 'private rights' from 'public rights.'" 458 U.S. at 69 n. 23 (emphasis added). In *Granfinanciera*, the Court clarified its *Northern Pipeline* comment, holding that having the federal government as a party is not a necessary component of a public right. Instead, the Court clarified (in 1989) that courts must look to the nature of the regulatory scheme Congress established. If the right is not closely intertwined with that regulatory scheme and does not belong to or exist against the federal government, it must still be adjudicated by a court, subject to the Seventh Amendment. Even when the government is a party to the proceeding or the right is closely intertwined with a regulatory scheme, *Granfinanciera* requires courts to analyze the nature of the claim, not the identity of the parties, in determining whether the Seventh Amendment applies. As the Court noted, the fact that a claim "originate[d] in a newly fashioned

20

regulatory scheme" does not "permit Congress to eviscerate the Seventh Amendment's guarantee" to a jury trial. 492 U.S. at 52. Nowhere did the Court either hold or intimate that the nature of the claim was the central focus of public rights analysis only in cases involving private parties.

In *Jarkesy*, the Court held that the ruling in *Granfinanciera* applied, regardless of whether the government was a party to the suit, restating the point it had made there that Congress was without power to move the adjudication of a common law claim to an agency just by creating a new regulatory mechanism. 603 U.S. at 135 (quoting *Granfinanciera*, 492 U.S. at 52.) The Court in *Jarkesy* relied on *Granfinanciera* for the principle that, regardless of the identity of the parties or the nature of the regulatory scheme, Congress cannot take suits at common law or claims that are legal in nature and adjudicate them in fora that do not provide a jury.

More to the point, the Court made clear that it had never held that the presence of the federal government as a party is sufficient on its own to trigger the public rights exception. *Id*. at 135 (quoting *Northern Pipeline*, 458 U.S. at 69 n. 23). Thus, according to *Jarkesy*, *Granfinanciera* and *Northern Pipeline* had already definitively decided that the crucial inquiry is whether the claim is a suit at common law or legal in nature, regardless of whether the case involved two private parties or the government and a private party.

For the accrual suspension rule to apply here, the plaintiffs must show that the pre-*Jarkesy* precedents foreclosed their ability to pursue the claims they now allege; they did not. The plaintiff must also show that *Jarkesy* overruled or altered those pre-*Jarkesy* precedents. Again, the plaintiffs cannot do so. As the *Jarkesy* majority itself recognized, *Granfinanciera* effectively dictated the outcome in *Jarkesy*. *See Smith,* 171 F.4th at 809-10.

The plaintiffs attempt to rebut this reading of the precedents by relying on the dissent in *Jarkesy*. (ECF 14 at 24-26.) Whether the majority's summary of the Court's precedents or the dissent's critique is more accurate is an academic matter that has no bearing on a lower court's responsibility to apply the holding and reasoning of a majority opinion of a higher court. The dissent's critique of the majority's explanation and application of the precedents may not control the conclusion here.

*Jarkesy* was consistent with the Court's various precedents on the public rights doctrine and when Congress may withdraw the adjudication of a claim from the application of the Seventh Amendment. The precedents did not preclude the plaintiffs from demanding a jury trial on a direct appeal or on a claim for an illegal exaction in this court before the decision in *Jarkesy*. It flows, as well, that *Jarkesy* itself does not reflect an intervening change in the law. Instead, *Jarkesy* reaffirmed that *Granfinanciera* had provided the plaintiffs with all the information they required to know they had a viable claim. The plaintiffs cannot rely on *Jarkesy* to support their invocation of the accrual suspension rule.

### B. Did Federal Circuit Precedent Foreclose the Plaintiffs' Pre-**Jarkesy** *Claims*

Even if the Supreme Court's caselaw did not foreclose a successful claim by the plaintiffs before *Jarkesy*, the plaintiffs argue that the Federal Circuit's decision in *Ninestar* foreclosed their

21

ability to sue successfully for an illegal exaction before *Jarkesy* was decided.[3]  The plaintiffs argue that *Jarkesy* fundamentally changed the public rights doctrine, as it had been applied by the Federal Circuit in *Ninestar*.  (ECF 14 at 22.)  The plaintiffs structure their argument as follows: *Ninestar* barred the plaintiffs from bringing their illegal exaction claims pre-*Jarkesy*, but, because *Jarkesy* operates as an intervening change in the law, *Ninestar* is no longer applicable.  To prevail on this argument, the plaintiffs must show that, before *Jarkesy,* their illegal exaction claims would have been barred by *Ninestar,* and that *Jarkesy* operates as an intervening change in the law rendering *Ninestar* inapplicable.

It necessarily follows from the analysis in the previous section of this opinion that *Jarkesy* is not an intervening change in longstanding Supreme Court precedent, and therefore it did not render *Ninestar* inapplicable.  The accrual suspension rule analysis could end there.  In the interest of thoroughness, however, this section evaluates whether *Ninestar* would have barred the plaintiffs' illegal exaction claims pre-*Jarkesy*.

Prior to *Jarkesy*, *Ninestar* had applied the public rights doctrine in a way that would have barred the plaintiffs from bringing an illegal exaction claim in this court by largely relying on the approach laid out in *Atlas Roofing* to determine when a claim involves a public right.  *Jarkesy* undermined *Ninestar*, allowing the plaintiffs to proceed with their illegal exaction claims.

When "the facts are dramatically different," the viability of hiding behind an earlier case as a reason not to pursue litigation based on different facts and then seeking to apply the accrual suspension rule is suspect.  *See Boyajian*, 129 Fed. Cl. at 340; *see also Ciapessoni v. United States*, 129 Fed. Cl. 332, 335 (2016); *Lion Farms, LLC v. United States*, 129 Fed. Cl. 521, 524-525 (2016).  As an exception to the statutory rule establishing a strict jurisdictional deadline for suits in this court, accrual suspension must be applied in limited circumstances, and only when the precedent putatively foreclosing a claim is directly on point.  To allow for a broader application would threaten to allow the exception to swallow the statute of limitations.  In this respect, the accrual suspension is more demanding than the futility rule examined in *Smith*, 171 F.4th at 810-11.  To secure the benefit of accrual suspension, the plaintiffs must show that the result of a pre-*Jarkesy* claim would have been "preordained."  *Id*. at 811.  The plaintiffs cannot do so.  *Ninestar* is not analogous to the plaintiffs' claim regarding SEC civil penalties and would not have prevented the plaintiffs from bringing their illegal exaction claim before *Jarkesy*.

The Supreme Court in *Jarkesy* distinguished *Atlas Roofing* from *Jarkesy* and *Granfinanciera* based on the facts of each case, holding that the public rights exception applied differently depending on the nature of the claim, and the agency and regulatory scheme involved.  *Jarkesy*, 603 U.S. at 136-37.  The Court's application of the public rights exception to the specific facts of each case reflects the evolution of the doctrine and its application to different

---

[3] The plaintiffs also argue that *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986) is another relevant precedent that would have foreclosed a successful claim. Both cases address the public rights exception and its applicability to the ITC.  Because only *Ninestar* was decided after *Granfinanciera*, it is only necessary to address that case.

scenarios. The focus was consistently on the nature of the underlying legal issue and whether it existed or is analogous to one that existed at common law.

The public rights analysis is highly fact dependent, and the facts in *Ninestar* differ from those here in ways that preclude the earlier case from being read as foreclosing the plaintiffs' claims.

In *Ninestar*, the ITC issued civil penalties after Ninestar failed to abide by an exclusion order. In effect, the ITC imposed a penalty in furtherance of its regulatory authority and not as a sanction for the initial violation. In upholding the penalty, the Federal Circuit quoted the portion of *Atlas Roofing* for the proposition that when "Congress 'created a new cause of action, and remedies therefor, unknown to the common law, and placed their enforcement in a tribunal supplying speedy and expert resolutions of the issues involved,'" the Seventh Amendment is no bar to the imposition of a civil penalty. 667 F.3d at 1384 (quoting *Atlas Roofing*, 430 U.S. at 460-61). The Circuit also referred briefly to *Granfinanciera*. Ultimately, the Circuit concluded that the ITC regulatory framework is "integral to the control of unfair competition in trade, and the provision of a civil penalty is within regulatory authority and is appropriately assigned to the administrative agency." *Id*. Inherent in this conclusion is the point the Circuit had made in quoting *Atlas Roofing* that the nature of the ITC proceeding was unknown at common law. That conclusion does not speak at all to the application of the public rights doctrine to the SEC's authority to impose civil penalties without a jury.

The SEC brought its charges against each of the plaintiffs here for the alleged commission of fraud. These claims, as *Jarkesy* concluded, resembled common law fraud charges and were therefore subject to the application of the Seventh Amendment. That distinction is crucial to the determination of whether the public rights doctrine applies, and it depends on the nature of the claim and the regulatory framework supporting the charges. To assign to *Ninestar* the preclusive effect the plaintiffs propose is fatally flawed and fails to undertake the analysis required. *Ninestar* was not some talismanic invocation of the public rights doctrine. It was consistent with the Supreme Court's precedents at the time and applied them to a process that had no common law analogue. *Ninestar* in no way would have presaged the failure of the plaintiffs' claims before *Jarkesy*, and the plaintiffs may not seek to hide behind it now to invoke accrual suspension.

Other courts have also held that a public-rights-exception analysis in one type of regulatory regime is not an intervening change in controlling law "as applied" to other causes of action in different regulatory regimes. *See United States v. Schwarzbaum*, 18-CV-81147, 2026 WL 741852, at *16 (S.D. Fl. Mar. 16, 2026); *see also Ortega v. Off. of the Comptroller of the Currency*, 155 F.4th 394, 402-04 (5th Cir. 2025); *Manis v. U. S. Dep't of Agric.*, 796 F. Supp. 3d 178, 204-06 (M.D. N.C. 2025).

The parties provide no examples of a circuit court or the Supreme Court conducting a public rights analysis on the SEC's in-house process for imposing fraud penalties, before the Fifth Circuit and Supreme Court decisions in *Jarkesy*. Had the plaintiffs brought their illegal exaction claims before *Jarkesy*, and with *Ninestar* offering little guidance on how the public rights exception would be applied in the context of the SEC, no precedent applied to foreclose a successful suit in this court.

23

For accrual suspension to apply and render the plaintiffs' claims timely, the plaintiffs must show that they were foreclosed from bringing their claims before an intervening change in the law. *Boyajian*, 129 Fed. Cl. at 340. *Jarkesy* was not an intervening change in the law, and *Ninestar* was not a controlling or authoritative precedent on the scope of the public rights doctrine to SEC fraud penalties. There was no law or precedent preventing the plaintiffs from bringing their illegal exaction claims before *Jarkesy*. Thus, the plaintiffs may not avail themselves of the benefit of the accrual suspension rule.

### C.  *Mr. Ahmed's Claim*

The plaintiffs contend that Mr. Ahmed's claim remains timely because he paid at least $14,500 to the government within the six years prior to the filing of his complaint. Relying on *Bennett v. United States*, 169 Fed. Cl. 486 (2024), *app. dismissed*, No. 2024-1674, 2026 WL 1241831 (Fed. Cir. May 6, 2026), and *Corner Post, Inc. v. Bd. of Govs. of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024), the plaintiffs argue that "when a plaintiff makes a series of compelled payments to the Government, an illegal exaction claim accrues under [28 U.S.C.] § 2501 on [the] date of the last payment." (ECF 14 at 29.) Because Mr. Ahmed has made payments within the limitations period, the plaintiffs maintain his claim for all payments that have been made since the settlement agreement was entered remains timely and he may seek to recover the $900,000 he has paid toward the disgorgement amount he and his companies owed the SEC and the $18,236.32 in civil penalties he has paid since 2015.

The defendant counters that Mr. Ahmed was aware of his injury when the SEC entered the settlement agreement order requiring payment. The defendant argues that the statute of limitations is not postponed until the full extent of the penalty to be paid is known. *See Navajo Nation v. United States*, 631 F.3d 1268, 1277 (Fed. Cir. 2011) (quoting *Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000)). According to the defendant, when the settlement was entered and the SEC credited $900,000 toward the sum Mr. Ahmed owed in disgorgement and Mr. Ahmed began making payments, Mr. Ahmed knew the full extent of his illegal exaction claim. The defendant maintains that the SEC's decision to permit periodic payments and toll additional interest does not alter the fact that "all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Kinsey v. United States,* 852 F.2d 556, 557 (Fed. Cir. 1988) (quoting *Oceanic S.S. Co. v. United States,* 165 Ct. Cl. 217, 225 (1964)). Because the relevant events occurred more than six years before this case was filed, the statute of limitations on Mr. Ahmed's claim for an illegal exaction has run.

The plaintiffs rely on *Bennett* and *Corner Post* to support their argument that Mr. Ahmed's claim could not have accrued until the date of his last payment, August 18, 2025.

*Bennett* is not helpful to the plaintiffs. For one thing, the opinion was vacated following a motion for reconsideration. Order, *Bennett v. United States*, No. 23-694 (Oct. 31, 2024). Even if the opinion cited by the plaintiffs had not been vacated, it would not support the plaintiffs' argument. In *Bennett*, the plaintiff made victim-restitution payments to the government after a criminal conviction. The payments were made over time, and the plaintiff sued for an illegal exaction, alleging his payments had not been disbursed to his victims. In full, the discussion on whether each of his payments reset the statute of limitations reads:

24

> [t]o the extent that Plaintiff's claim that Defendant is keeping his payments without properly distributing them to his victims relies on his provided payment history, Plaintiff has not demonstrated a payment since June 29, 2015. The statute of limitations for any claims of payments made that Plaintiff now wishes returned therefore ran in June 2021.

*Bennett*, 169 Fed. Cl. at 500.

The plaintiffs argue that these two sentences hold that "an illegal exaction claim accrues under § 2501 on date of the last payment." (ECF 14 at 29.)

The plaintiff in *Bennett* was proceeding *pro se* and therefore entitled to a liberal construction of his claim. His claim was too late, whatever relevant date alleged in the complaint was the correct accrual date. The brief discussion in the opinion cannot bear the weight the plaintiffs seek to give it. The discussion appears simply to select the latest accrual date possible from the facts alleged in the complaint to indicate to a *pro se* plaintiff that, no matter what date was chosen as the accrual date, his claim was untimely. The decision does not stand for the proposition that each payment to the government alleged to constitute an illegal exaction starts the clock running anew when the payments are based on a single order that establishes the plaintiff's purported liability.

The plaintiffs also rely on *Corner Post* to support the proposition that Mr. Ahmed could not file suit until he made the payments he has. In fact, *Corner Post* appears to support the opposite conclusion. In *Corner Post*, the Supreme Court held that "[a] right of action 'accrues' when the plaintiff has a 'complete and present cause of action,' which is when she has the right to 'file suit and obtain relief.'" 603 U.S. at 800 (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016)). The case holds that a plaintiff pursuing a claim under the Administrative Procedure Act ("APA") does not have a complete and present cause of action until there is an injury from final agency action. Thus, the statute of limitations does not begin to run until the injury is incurred. *Id*. at 809 (internal citations omitted).

*Corner Post* offers the plaintiffs no support. To begin, the rules governing the statute of limitations for APA claims differ from those governing Tucker Act claims, but even setting that point aside, *Corner Post* appears to instruct a court to determine the date the plaintiff had a complete and present cause of action as the date an agency took final action applicable to that plaintiff. In other words, the decision appears consistent with the normal rule of Tucker Act accrual of a claim, which is that a claim accrues "as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, *i.e.,* when 'all events have occurred to fix the Government's alleged liability, entitling the plaintiff to demand payment and sue here for his money.'" *Martinez*, 333 F.3d at 1303 (quoting *Nager Elec. Co. v. United States*, 368 F.2d 847, 851 (Ct. Cl. 1966). For Mr. Ahmed, the relevant action by the Commission would remain the date the settlement agreement was entered, not the date he made any of the payments.

As noted, the SEC imposed its sanctions on Mr. Ahmed more than six years before this case was filed. The defendant argues that Mr. Ahmed's claim accrued with the imposition of those sanctions, when all the events necessary to fix liability occurred. The defendant notes that

25

Mr. Ahmed could rely on the date of each individual payment to reset the accrual date of the illegal exaction, if the continuing claims doctrine applies. (ECF 16 at 15.)

Claims for an illegal exaction are subject to 28 U.S.C. § 2501's six-year statute of limitations. *Washington Fed. v. United States*, 26 F.4th 1253, 1262-63 (Fed. Cir. 2022). An illegal exaction occurs when a "'plaintiff has paid money over to the [g]overnment, directly or in effect, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (quoting *Eastport S.S. Corp.* 372 F.2d at 1007).

An illegal exaction claim is one "made for recovery of monies that the government has required to be paid contrary to law." *Id* at 1572. "'[A]n illegal exaction claim has two elements: 1) that money was taken by the [g]overnment; and 2) that the exaction violated a provision of the Constitution, a statute, or a regulation.'" *Botello v. United States*, 173 Fed. Cl. 26, 44 (2024) (quoting *Andres v. United States*, No. 03-2654, 2005 WL 6112616, at *2 (Fed. Cl. July 28, 2005)).

An illegal exaction claim ripens when a plaintiff makes a payment to the government, *i.e.*, "[w]hen 'the Government has the citizen's money it its pocket.'" *Aerolineas Argentinas*, 77 F.3d at 1573 (citing *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954)). The question presented here is whether each of Mr. Ahmed's successive payments restarts the statute of limitations for his illegal exaction claim anew, when those payments all stem from the entry of his settlement agreement with the SEC, which is a single, distinct event.

The continuing claims doctrine allows a plaintiff to seek relief for claims outside the statute of limitations when the plaintiff pleads "a series of distinct events – each of which gives rise to a separate cause of action – as a single continuing event." *Ariadne Fin. Servs. Pty. Ltd. v. United States,* 133 F.3d 874, 879 (Fed. Cir. 1998). Claims may be categorized either as a series of distinct harms, each violating a statute, regulation, or the Constitution and each giving rise to a separate claim for damages or as a single, distinct harm that results in ongoing or repeated damage, giving rise only to one claim. *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1457 (Fed. Cir. 1997). The continuing claims doctrine applies only when "a plaintiff's claim is 'inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages.'" *Tamerlane, Ltd. v. United States,* 550 F.3d 1135, 1145 (Fed. Cir. 2008) (quoting *Brown Park Estates–Fairfield Dev. Co.,* 127 F.3d at 1456). It does not apply to claims based on a single distinct event with continuing adverse effects. *Ariadne Fin. Servs.*, 133 F.3d at 879; *see also Goodrich v. United States,* 434 F.3d 1329, 1336 (Fed. Cir. 2006) ("[T]he obligation to sue arises once the permanent nature of the government action is evident, regardless of whether damages are complete and fully calculable."). Thus, for a claim involving continuing harms that cannot be broken down into independent and distinct events, accrual occurs "'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" *Goodrich,* 434 F.3d at 1333 (quoting *Hopland Band of Pomo Indians,* 855 F.2d at 1577).

The continuing claims doctrine has also been analyzed in connection with illegal exaction claims. *See Jordan v. United States*, 158 Fed. Cl. 440, 455 (2022); *Adera v. United States*,

26

155 Fed. Cl. 553, 558 (2021), *aff'd*, No. 2022-1074, 2023 WL 3768645 (Fed. Cir. June 2, 2023). "For the [continuing claims] doctrine to apply to save an otherwise untimely [illegal exaction] claim, the claim must be 'inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages.'" *Jordan*, 158 Fed. Cl. at 455 (quoting *Wagstaff v. United States,* 105 Fed. Cl. 99, 112 (2012), itself quoting in turn *Tamerlane*, 550 F.3d at 1145).

In *Wagstaff*, a plaintiff brought an illegal exaction claim when the Department of Education offset her tax refunds and garnished her wages to recover her student-loan debt after the plaintiff had failed to make payments toward that debt. The agency's determination to offset the plaintiff's tax refunds and garnish her wages was made on August 26, 2004. The plaintiff sued for an illegal exaction more than six years after that date. The plaintiff argued that her claim was timely under the continuing claims doctrine because the agency continued to offset her tax refunds and garnish her wages within six years of filing suit, and each separate tax-refund offset and wage garnishment constituted a new, distinct claim. Her argument that the continuing claims doctrine rendered her complaint timely was rejected because "the alleged illegal exaction accrued when the events that fixed [the p]laintiff's liability occurred, *i.e.*, when the Department of Education made its respective final determinations." *Id*. at 112. It was the date by which the last of those determinations was made that established the accrual date of the claim, even though the determinations had continuing effects through multiple offsets and garnishments extending to within six years of the filing of the complaint. Each adverse event flowed from the initial determinations and did not have its own "associated damages." Chief Judge Solomson's decision in *Jordan* is to similar effect, 158 Fed. Cl. at 455-56, as is Judge Davis's holding in *Adera*, 155 Fed. Cl. at 558, which the Federal Circuit affirmed.

These decisions govern the outcome here. Mr. Ahmed consented to an order, entered on August 14, 2015, requiring him to pay civil penalties.[4] Mr. Ahmed did not appeal the order and began making payments toward his civil penalties soon thereafter. Although he has made some payments within six years of the date of the amended complaint, each payment is a byproduct of the settlement agreement. The settlement agreement sets forth the entire civil penalty levied against Mr. Ahmed. Therefore, the event that fixed his liability occurred when the settlement agreement was entered.

The amended complaint itself alleges only one wrong by the government:

The SEC exacted a payment of $900,000 from Mr. Ahmed's company Success Trade Securities, Inc. through its order in *Ahmed*. Pursuant to the SEC's order, Mr. Ahmed liquidated Success Trade Securities, Inc. and paid $900,000 from the proceeds of the company's assets towards the disgorgement amount he and his companies jointly and severally owed to the SEC. As the sole owner of now-liquidated Success Trade Securities, Inc., Mr. Ahmed is the successor to that

---

[4] Because Mr. Ahmed's claim is untimely, the defendant's argument that Mr. Ahmed waived his right to bring any claim when he settled with the SEC is not addressed.

company. The SEC also exacted payments of $18,236.32 from Mr. Ahmed through its order in *Ahmed*.

(ECF 12 at ¶¶ 59-60.)

A claim that alleges a single allegation of wrongdoing is, on its face, not susceptible to being broken down into a series of distinct and independent wrongs. The plaintiffs allege that the order against Mr. Ahmed, not the individual payments, was the wrongdoing, an act in contravention of the Seventh Amendment, to trigger the illegally exacted payments. These separate, successive payments may quantify the damages Mr. Ahmed suffered, but each payment was "not [an] independently accruing violation[] of any statutes or regulations . . . ." *Brown Park Estates–Fairfield Dev. Co.,* 127 F.3d at 1456. Instead, the plaintiffs allege but a single event with continuing adverse effects; the continuing claims doctrine is inapplicable in such a case. *Ariadne Fin. Servs.,* 133 F.3d at 879.

Because the continuing claims doctrine is inapplicable on the facts, as alleged, Mr. Ahmed's claim ripened upon the first payment to the government. At that point, the plaintiff alleges he had paid money to the government and that payment was made pursuant to an order that was issued by the SEC in contravention of the Seventh Amendment. *See Aerolineas Argentinas*, 77 F.3d at 1572-73. Because Mr. Ahmed's first payment was made more than six years before his complaint was filed, the statute of limitations has run, and his claim is untimely.

## VI.   CONCLUSION

*Jarkesy* did not constitute an intervening change in the law. As a result, the accrual suspension rule does not apply, and the plaintiffs' claims accrued when the SEC issued its final civil penalty orders, and the plaintiffs made their initial payments. Likewise, the Federal Circuit's decision in *Ninestar* did not preclude the plaintiffs from bringing the claims before the decision in *Jarkesy*. While Mr. Ahmed paid part of his penalty within six years of the date this case was filed, the continuing claims doctrine does not apply to him, because he is challenging the SEC's final order, whose terms he knew when it was entered and he made his initial payment.

All the plaintiffs' claims fall outside the six-year limitations period, and the complaint must be dismissed under RCFC 12(b)(1) and 12(h)(3). The defendant's motion to dismiss is granted. A separate order directing the entry of judgment will be filed separately.

s/ Richard A.  Hertling

**Richard A.  Hertling**
**Judge**

28